**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  08-20895-CR-UNGARO/SIMONTON**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**JORGE LUIS PACHECO, et al.,**

      **Defendants.**

_____/

## ORDER DENYING MOTIONS IN LIMINE TO EXCLUDE GOVERNMENT'S PHYSICIAN WITNESS

      **Presently pending before this Court is Defendant Keith Russell's Motion to Exclude Opinion Evidence (DE # 196) and Defendant Jorge Luis Pacheco's Motion to Exclude the Government's Physician Witness, Dr. Michael Wohlfeiler, M.D. (DE # 198), and a Supplemental Motion in Limine to Exclude the Government's Physician Witness Under _Daubert_, filed by Defendant Pacheco (DE # 261).  These motions were joined by Co-Defendant Eda Milanes (DE # 237, 238).  The Honorable Ursula Ungaro, United States District Judge, has referred this matter to the undersigned United States Magistrate Judge (DE # 220).  The Government has filed an expedited consolidated response in opposition to the Motions (DE # 245).  Oral argument on the Motions was held on January 30, 2009, followed by an evidentiary hearing on February 6, 2009.**

      **For the reasons set forth below, it is hereby ORDERED that the Motions are DENIED.  As explained in more detail below, and subject to the limitations set forth in this Order, Dr. Michael Wohlfeiler should be permitted to testify as an expert witness regarding the treatment of HIV/AIDS patients generally, including the standards of care**

in the medical community; and, the usage of and medical necessity for certain medications and treatments allegedly prescribed, administered and submitted to Medicare for reimbursement by the Defendants.  This Order is without prejudice, however, to renew the objection to this testimony at trial since it is predicated upon the Government's proffer of expected testimony by other witnesses, and is only a pre-trial determination that the opinion will be useful to the jury and that the probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues and considerations of undue delay.   The trial court will be in the best position to re-evaluate this determination during the course of the trial. *See United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990); *United States v. Rutkowski*, 814 F.2d 594, 598 (11th Cir. 1987)("Although defense counsel objected before trial to the admission of the evidence, the record reveals no objection during the trial.  'The overruling of a motion in limine is not reversible error, only a proper objection at trial can preserve error for appellate review.'"(citations omitted).

I.    BACKGROUND

Defendants Keith Russell, Eda Milanes and Jorge L. Pacheco are charged with three counts in a sixteen count indictment with participating in a health care fraud conspiracy and two related substantive counts regarding claims submitted to Medicare seeking reimbursements for the costs of certain injection and infusion treatments purportedly furnished to HIV/AIDS patients.  The Indictment alleges in Count 1 that Russell, Milanes and Pacheco conspired with their Co-Defendants and others to defraud a health care benefit program affecting commerce by: a) submitting false and fraudulent claims to Medicare; b) offering and paying kickbacks and bribes to Medicare beneficiaries; c) concealing the submission of false and fraudulent claims to Medicare;

2

and d) diverting proceeds of the fraud for the personal use and benefit of the Defendants and their co-conspirators; all in violation of 18 U.S.C. § 1349.  In Counts 4 and 7, Defendants Russell, Milanes and Pacheco are charged with violations of 18 U.S.C. §§ 1347 and 2 for committing acts in execution of a scheme to defraud a health care benefit program by submitting allegedly false and fraudulent Medicare claims for medically unnecessary and non-rendered injection and infusion treatments on behalf of Medicare beneficiaries.  The act in execution of the scheme alleged in Count 4 is the injection of filgrastim as to patient G.B. on March 24, 2006; the act in execution of the scheme alleged in Count 7 is the injection of filgrastim as to patient R.C. on August 1, 2006.

Although the Indictment references Medcore and M&P, two different clinics where the alleged fraudulent practices took place, Defendants Russell, Milanes and Pacheco are only alleged to have been affiliated with the M&P clinic.  Specifically, the Indictment alleges that Eda Milanes and Jorge Pacheco were employed as medical assistants at M&P who provided injection and infusion treatments to M&P patients that were not medically necessary.  Defendant Keith Russell is alleged to have been a licensed physician employed at M&P who conducted cursory examinations of Medicare beneficiaries and signed the required documentation to make it appear that the injection and infusion treatments billed by M&P were medically necessary and provided.  The Indictment also specifically identifies two Medicare Beneficiaries, the dates of treatment, and the treatments for which Medicare was billed by M&P.

II.    A SUMMARY OF THE MOTION TO EXCLUDE EXPERT TESTIMONY

In the instant Motions, Defendants Russell, Pacheco and Milanes ("Movants") seek to exclude the testimony of the Government's Physician Witness, Dr. Michael

Wohlfeiler, M.D.[1]  On December 31, 2008,  in its Fourth Response to the Standing

Discovery Order, the Government identified Dr. Wohlfeiler as an expert in immunology

and the treatment of patients with HIV/AIDS who would testify, among other things,

about the medical necessity of certain treatments for HIV/AIDS patients (DE #168).   The

opinions at issue, which were more fully discussed at the evidentiary hearing, are set

forth succinctly as follows in the government's discovery response and in Exhibit 2 at

the hearing:

> In addition to background testimony regarding the treatment of HIV/AIDS
> and the role that certain medications play in that treatment, the substance
> of [Dr. Wohlfeiler's] opinions will be as follows:
>
> (1)      In the last 10-15 years, since the advent of highly active
> anti-retroviral therapy ("HAART") which involves treating HIV/AIDS with a
> combination of oral medications, sometimes referred to as a "cocktail," it
> is not medically necessary or appropriate to treat HIV/AIDS patients with
> parenteral therapies such as infusions or injections.
>
> (2)      Thrombocytopenia is a disorder in which a patient's blood contains
> an abnormally low platelet count. Thrombocytopenia can only be
> diagnosed through a blood test, and cannot be detected through other
> symptoms alone, such as bleeding. Idiopathic Thrombocytopenic Purpura
> ("ITP") is a common cause of thrombocytopenia in HIV-positive patients.
>
> (3)      It is not medically necessary or appropriate to treat
> thrombocytopenia in HIV/AIDS patients. In general, the proper treatment of
> thrombocytopenia in HIV/AIDS patients is the treatment of HIV/AIDS itself,
> as the underlying disease that is causing the thrombocytopenia. Treatment
> of thrombocytopenia itself is only medically necessary in uncommon cases
> where a patient's platelet count falls below clinically significant levels or
> when the patient is actively bleeding.
>
> (4)      Even if treatment for thrombocytopenia itself were appropriate in
> the uncommon HIV/AIDS case, it would only be appropriate in connection
> with frequent and regular monitoring of a patient's platelet count through
> properly conducted laboratory tests. The same is true for the treatment of
> other blood disorders such as low white cell count and low red cell count.

---

[1]  Defendant David Rothman did not join in these motion, although his counsel
was present at the hearing held in connection with these motions.

**Outside of these parameters, medications such as gamma globulin, immune globulin, epoetin alfa, filgrastim, and sargramostim would not be medically necessary or appropriate. Infusions and injections of these medications are not routinely used in the treatment of HIV/AIDS patients.**

**(5)      It is not medically necessary or appropriate to treat patients with HIV/AIDS by infusing or injecting them with medications such as rituximab, corticotropin, interferon, and amifostine.**

**(6)      It is not medically necessary or appropriate in the routine treatment patients with HIV/AIDS, or its complications, to infuse or inject them with medications such as methylprednisolone acetate, infliximab, and other corticosteroids. These medications are typically contra-indicated in the treatment of HIV/AIDS in that HIV/AIDS patients are immunocompromised and these medications can further suppress the immune system.**

**(7)      It is not medically necessary or appropriate to treat patients with HIV/AIDS by infusing or injecting them with medications such as voriconazole. Oral medications are typically the appropriate treatment of fungal and other infections often experienced by HIV/AIDS patients.**

The government has made it clear that Dr. Wohlfeiler will not be asked to render an opinion regarding the medical necessity of treatment with respect to any of the specific patients treated at the clinics involved in this case.  The clinics were sold after the events alleged in the Indictment, and the patient files cannot be located.

In his Motion to Exclude Opinion Evidence, Defendant Russell asserted, inter alia, that Dr. Wohlfeiler should not be allowed to testify because: 1) the testimony is irrelevant since "medical necessity" is defined by the Local Medical Review Policies promulgated by Medicare's authorized insurance carriers; 2) the testimony is unfairly prejudicial; 3) the testimony would include the witness's personal judgment and legal background which would intrude on both the mental state issues and legal questions for the jury and serve to add confusion to the testimony; and 4) the testimony violates due process (DE #196).  In addition, the Defendant cited to Federal Rules of Evidence 702 and 704, and argued that, pursuant to those rules, the expert's testimony should be excluded.

Defendant Russell also noted that Dr. Wohlfeiler had not reviewed the files of the patients for whom the  Defendants allegedly submitted false claims and reimbursements to Medicare.

In his Motion in Limine to Exclude the Government's witness, Defendant Jorge Luis Pacheco raised almost identical arguments as those raised by Defendant Russell (D.E. # 198). In addition, Defendant Pacheco placed significant emphasis on the Local Medical Review Policies (LMRPs), which Defendant argues set forth the definition of "medical necessity" and also reflect the applicable standard of care for the prescription of medications billed by the Defendants.  Thus, Defendant Pacheco argues that since this is a criminal case, it does not involve a determination of  whether the quality of care was appropriate or whether it amounted to malpractice, and therefore Dr. Wohlfeiler's testimony is irrelevant.

In response to both Motions, the Government argues in its Opposition that the testimony of Dr. Wohlfeiler should be admitted as his opinions satisfy the requirements of Federal Rule of Evidence 702.  In addition, the Government argues that Dr. Wohlfeiler's testimony is relevant and it is not necessary for him to review the individual patient records in this case, as his opinion relates to the general medical necessity of the type of treatment allegedly provided by the Defendants rather than whether any of the billed treatments were necessary in any one case.  Rather, the Government asserts that Dr. Wohlfeiler's testimony will be presented along with other evidence to demonstrate that the treatments billed by the Defendants were fraudulent, and thus his testimony will be relevant to the entirety of the case.   The Government maintains that Dr. Wohlfeiler's testimony will educate the jury about medically necessary treatments for HIV/AIDs patients to help the jury better determine whether the treatments billed by the

6

Defendants were medically necessary.  Further, the Government argues that the LMRPs are not definitive statements of medical necessity and are not treatment guidelines but rather are billing guidelines related to reimbursements.  Accordingly, the Defendants' due process rights will not be violated if Dr. Wohlfeiler testifies about the medical necessity  of certain treatments since the LMRPs do not permit providers to submit fraudulent bills for medically unnecessary treatments.

During the oral argument on these motions on January 30, 2009, the Defendants requested an evidentiary hearing to further explore the nature and basis of Dr. Wohlfeiler's opinions.  Based upon the brevity of the Government's expert witness disclosure, and the lack of an expert report, the undersigned granted the request.  On February 6, 2009, the undersigned held an evidentiary  hearing on the Motions. At the hearing, Dr. Wohlfeiler testified regarding his opinions on the use and medical necessity of certain drugs/pharmaceuticals in the treatment of HIV/AIDS patients.  He also testified about the basis for his opinions and was cross-examined by counsel for the Defendants. The government introduced into evidence a chart summarizing the claims for reimbursement made by M&P, and explained that Dr. Wohlfieler had been asked to opine on the medical necessity for the top ten items billed (Govt. Ex. 1).  The government also introduced the letter confirming Dr. Wohlfeiler's opinion, as set forth in its expert witness disclosure (Govt. Ex. 2); and, the Curriculum Vitae of Dr. Wohlfeiler (Govt. Ex. 3). The defense relied upon Local Medical Review Policies (LMRP's) that were filed with the Court prior to the hearing (D.E. # 249).

After the hearing, Defendant Pacheco submitted a Supplemental Motion in Limine, wherein he raised additional questions about the methodology and data utilized by Dr. Wohlfeiler and provided additional legal authority to support of his position that Dr.

7

Wohlfeiler should not be allowed to testify at trial.

III.   **FINDINGS OF FACT**

Based upon the testimony and exhibits presented at the evidentiary hearing, the undersigned Magistrate Judge makes the following Findings of Fact.[2]

1.  As reflected in his Curriculum Vitae  (Govt. Ex. 3), Dr. Michael Bruce Wohlfeiler has the following educational background: 1972 Bachelor of Arts degree in Political Science  from the University of Arizona; 1980 Juris Doctor from the University of Arizona College of Law; 1987 Doctor of Medicine from Rush Medical College.  Dr. Wohlfeiler completed  his Internship/Residency in Internal Medicine at the University of Miami/Jackson Memorial Hospital, between July 1987 and July 1990.  Dr. Wohlfeiler holds several professional certifications, including certification as a Credentialed HIV specialist by the American Academy of HIV Medicine.  He is a Diplomate of  the American Board of Hospice and Palliative Medicine.

2.  Dr.  Wohlfeiler has published several chapters and articles on HIV/AIDS related topics and has participated as both the principal investigator and sub investigator on numerous HIV/AIDS related protocols involving the testing of various pharmaceuticals and therapies on patients.  Dr. Wohlfeiler has not published any articles dealing with anemia, rheumatoid arthritis, or fungal infections.

3.  Since the year 2000, Dr. Wohlfeiler has served as the Medical Director of Special Immunology Services at Mercy Hospital in Miami, Florida, and between 2003 and 2004 he served as the Chair of the Florida Academy of HIV Medicine.  Dr.  Wohlfeiler has

_____

[2]  In this section, the undersigned is not rendering an opinion as to the truth of Dr. Wohlfeiler's opinions, but is finding only that these are the opinions as to which he testified.

also had significant professional experience in the HIV treatment field through the
Laureate Forum in HIV from 1998 to the present, as an Immunology Distinguished
Faculty member for Bristol-Myers, Squibb from 1993 to the present, and as the Medical
Director/Team Physician for VITAS Innovative Hospice Care from 1990-98.  He is a
member of several professional organizations related to the treatment of HIV/AIDS
patients, including serving as Vice-President of the Florida Academy of HIV Physicians
from 2000 to the present.  He has also served as a clinical investigator and on the
advisory speakers bureau for several prominent pharmaceutical companies.

4.  Dr. Wohlfeiler currently maintains a private practice that specializes in the
treatment of HIV disease, and has been in private practice with an emphasis on HIV
disease since 1990.   In his treatment of patients, he frequently acts as their primary care
physician and treats all complications that may accompany the HIV/AIDS disease.  His
practice has approximately twenty-five hundred (2500) active patients with HIV infection,
and is the largest private practice for the treatment of HIV/AIDS patients in South Florida.
Dr. Wohlfeiler treats approximately half of those patients himself, and his partner treats
the other half.  Approximately 25% of the HIV patients treated by Dr. Wohlfeiler's practice
receive health coverage through Medicare.  However, in treating his patients, Dr.
Wohlfeiler does not follow the local medical review policies (LMRP) promulgated by the
Medicare program because he views those policies as billing guidelines.

5.  Prior to the hearing, the Government presented Dr. Wohlfeiler with a list of the
top ten drugs that were allegedly billed by M&P to Medicare related to the treatment of
HIV/AID patients (Govt. Ex. 1).   Dr. Wohlfeiler reviewed the list and provided an opinion
on the medical necessity of the identified drugs in the treatment of HIV/AIDS patients.
This opinion was summarized in a confirming letter dated December 31, 2008 written to

9

Dr. Wohlfeiler by the prosecutor in this case[3] (Govt. Ex 2).  Dr. Wohlfeiler reviewed the

letter prior to the hearing, and agreed that the letter reflected his opinions generally

about the medical necessity of the use of specific drugs in the treatment of HIV/AIDS

related conditions.  Dr. Wohlfeiler did not review any of the individual patient charts in

this matter.[4]

6.  Dr. Wohlfeiler testified that prior to late 1995 and early 1996, no medications

sufficiently suppressed HIV completely and over the long-term.  However

with the advent of proteinase inhibitors after that time, HIV began to be treated with

highly active anti-retroviral therapy which allowed for a combination of medicines to be

used to suppress HIV in the majority of patients.  That combination of drugs is known as

a "cocktail".  The use of the cocktail treatment allows HIV to be a chronically managed

disease rather than a rapidly terminal illness.  The cocktail works by suppressing the HIV

virus and allowing a partial recovery of the immune system, which causes many of the

complications associated with HIV to disappear.

7.  Dr. Wohlfeiler testified that for the most part today, treatment of the

underlying HIV takes priority over treating the symptoms associated with the virus.   He

_____

[3] In Exhibit 1, the Government presented a chart of Medicare Data reflecting billing codes that were used by the M&P Clinic in billing Medicare.  The Government requested that Dr. Wohlfeiler render an opinion regarding the medical necessity of the top ten or twelve drugs and/or treatments that made up the bulk of the billing to Medicare.   The chart and Dr. Wohlfeiler's opinion also included the top billing drugs and/or treatments from the Medcore Clinic, where Defendants Russell, Milanes and Pacheco did not work.  The drugs listed on the chart, about which Dr. Wohlfeiler opined, are lymphocyte immune globulin, antithymocyte globulin, equine, filgrastim, methylprednisolone acetate, voriconazole, infliximab, gamma globulin, amifostine, epoetin alfa, cytomegalovirus immune globulin and rituximab.

[4] It is undisputed that no patient charts are available.  The clinics at issue were sold, and the whereabouts of those charts, if they still exist, is unknown.

testified that parenteral therapies, including infusions and injections, become unnecessary when the underlying HIV/AIDS disease is treated with a cocktail.

8.  One of the diagnoses made with respect to the patients in the case at bar to support the allegedly unnecessary treatments is thrombocytopenia. Dr. Wohlfeiler explained that thrombocytopenia refers to an abnormally low number of platelets.  He confirmed that through his practice he is familiar with the diagnostic tests used to diagnose thrombocytopenia and the appropriate treatment for the condition.  He testified that idiopathic thrombocytopenic purpura (ITP) is a type of thrombocytopenia most commonly found in HIV/AIDS patients; it is of unknown origin, and occurs when a person's own immune system attacks and destroys that person's own platelets.  If there are not enough platelets, a person may experience spontaneous bleeding; or may bleed too much when injured.   He testified that ITP is not a problem in the vast majority of HIV/AIDS patients, since people have many more platelets, ranging from 140,000 to 450,000, than they need to stop bleeding.    Dr. Wohlfeiler testified that ITP spontaneous bleeding usually does not occur until the platelet count drops below 10,000.   He testified that until a person's platelet count reaches the 10,000 level, the proper course is to treat the underlying HIV condition as opposed to the complications of thrombocytopenia.  He further testified that there are different types of thrombocytopenia, not caused by HIV (where the platelets are being manufactured and but are being destroyed at an excessive rate), but rather may be caused by failure of the bone marrow to produce platelets.

9.  Dr. Wohlfeiler confirmed that it is not medically necessary or appropriate to treat thrombocytopenia itself in HIV/AIDS patients, rather, the proper treatment is to treat HIV/AIDS as the underlying disease that is causing the thrombocytopenia.  He further testified that specific treatment for thrombocytopenia in HIV/AID patients is only

medically necessary in uncommon cases where a patient's platelet count falls below clinically significant levels or when the patient it actively bleeding.  He acknowledged however, that some people might treat ITP above the 10,000 platelet count and that bleeding due to trauma could occur at a 50,000 platelet count level.

10.  Dr. Wohlfeiler explained that in cases where it is necessary to treat thrombocytopenia directly, appropriate follow up lab work must be conducted in order to determine if the treatment is working by improving the platelet count.  He testified that typically, if the treatment works, the response will be very rapid and follow up within a week of administering the treatment is appropriate.   At the same time treatment is being administered directly for thrombocytopenia, the underlying HIV should also be treated, and the HIV treatment alone should bring the platelet count up, thereby ending the need for the direct independent treatment of thrombocytopenia.   The patient's condition should then be monitored and the direct treatment of thrombocytopenia could be reinstituted, if necessary.

11.  Dr. Wohlfeiler testified that when treating the thrombocytopenia directly it is critical to have accurate blood and lab work and to monitor the patient's platelet count to ensure that the condition is appropriately treated and managed.  He testified that the patients' complete blood count (CBC), including white and red count, should also be monitored.

12.  In his opinion, Dr. Wohlfeiler confirmed that outside of these parameters infusions and injections of medications such as gamma globulin, immune globulin, epoetin alfa, filgrastim and sargramostim would not be medically necessary or appropriate; and, these drugs are not routinely used in the treatment of HIV/AIDS patients.  Dr. Wohlfeiler testified that gamma globulins are a type of drug that provide a

12

concentrated dose of general antibodies.  Dr. Wohlfeiler explained that the immune system can be divided into two broad categories, the humoral or antibody mediated immune system and the cell mediated immune system. Gamma globulins are used to treat the humoral or antibody mediated portion of the immune system which is generally produced and regulated by B cells or B lymphocytes.   He testified that the other portion of the immune system, the cell mediated immune system, is controlled by T cells or T lymphocytes.  Dr. Wohlfeiler confirmed that HIV/AIDS attacks the T lymphocyte portion of the immune system and not the humoral or antibody mediated part of the immune system, thus gamma globulins are not used to treat the condition of HIV/AIDS.   Dr. Wohlfeiler stated that gamma globulin can be used to treat  ITP, but would only be the appropriate treatment in rare cases.

13.   Dr. Wohlfeiler testified that immune globulin is the same thing as gamma globulin.  He identified antithymocyte globulin as a very specific type of immune globulin that works as an immune suppressant of the cell mediated immune system and is prescribed to stop the rejection of organ transplants.    He testified that he only knows of antithymocyte being used in cases of organ transplantation. Dr. Wohlfeiler testified that if you treat and HIV patient with a drug that further suppresses their immune system, you can worsen the condition of the patient.

14.   Dr. Wohlfeiler testified that epoetin alfa is a naturally occurring hormone that stimulates bone marrow red blood cell growth, and is used to treat certain types of anemia, and is primarily used in end stage renal disease.   Epoetin alfa is often not needed if the underlying HIV is treated.

15.   Dr. Wohlfeiler testified that filgrastim stimulates the production of certain white blood cells, called neutrophils, which are used in treating bacterial infections.  It is

primarily used when treating chemotherapy patients, although there might be occasions when you would use it in the short term for HIV patients, typically when another drug is causing the white blood count to diminish.

16.   Dr. Wohlfeiler testified that another drug, sargramostim also stimulates the production of certain white blood cells, specifically neutrophils and monocytes.  Dr. Wohlfeiler testified that he has never seen this drug administered in an HIV setting.[5]  He testified that it is primarily used in bone marrow transplants to try to stimulate the production of blood cells.

17.   Dr. Wohlfeiler testified that cytomegalovirus (CMV) is a viral infection which most people are exposed to at some point but it does not usually cause a problem in most people unless their immune system is low.  CMV may occur in patients after organ transplants because the patients are placed on immuno suppressant medication and thus CMV is able to reactivate.  Patients who have CMV, or are likely to get CMV, are treated with specific immune globulin.

18.   Dr. Wohlfeiler opined that it is not medically necessary or appropriate to treat patients with HIV/AIDS by infusing or injecting them with medications such as rituximab. corticotropin, interferon or amifostine.  He testified that rituximab is an immune suppressive drug, and that he has never seen this drug administered in an HIV setting. He testified that a patient with a weakened immune system should not be given a

---

[5] As described *infra*., Dr. Wohlfeiler testified that there were several drugs that he had not heard of before the government asked him to render an opinion about the drug. He read the package inserts and the PDR about those drugs to arrive at his opinions.  Dr. Wohlfeiler stated that he uses a drug reference cite "Rx.List.com" to conduct research about drugs and also uses the John Hopkins University site.  Dr. Wohlfeiler testified that he relied on different textbooks in arriving at his opinion including the text of AIDS therapy by the American Academy of HIV Medicine.

medicine that will further suppress their immune system.  He testified that certain drugs, including those used to treat rheumatoid arthritis, contain  big warnings in a "black box" that discuss the risks of immune suppression and infection for patients on those types of medication.  He confirmed that giving someone an immuno suppressive drug while treating HIV/AIDS disease results in the treatments working against one another.

19.  Dr. Wohlfeiler testified that corticotropin is an immuno suppressive drug that is used primarily in treating certain types of malignancies.   As with other drugs discussed above, he has never seen this drug administered in an HIV setting; and he verified its usage by relying on published literature.

20.  Dr. Wohlfeiler testified that the drug Interferon is a cytokine which is a immune modulator.  He testified that the drug might be administered in an HIV setting as part of a treatment for a patient who has chronic Hepatitis C and HIV.   He testified that he has only seen it used for a limited amount of time with patients who have active hepatitis C along with HIV, and that patients typically have a poor ability to stay on the treatment because of all of the side effects.

21.  Dr. Wohlfeiler testified that the drug amifostine is intended to be given to patients with advanced ovarian cancer who are receiving a particular type of chemotherapy.  It is designed to prevent kidney toxicity.  Dr. Wohlfeiler testified that he had never used this drug and he had never seen this drug administered in an HIV setting.  Based upon his review of the literature, he has no idea how it would be used in an HIV setting.

22.  Dr. Wohlfeiler explained that corticosteroids are very potent anti-inflammatory medicines that are used to treat inflammatory diseases, like rheumatoid arthritis or asthma, where an inflammation of the airways occurs.  He testified that

methylprednisolone acetate is a very common corticosteroid, and stated that the particular methylprednisolone at issue in the case at bar is non oral and may be given by injection or infusion.  Patients who need to be treated with this drug are given the oral form of this drug rather than the injection, unless the patient is unable to swallow or not conscious.[6]

23.  Dr. Wohlfeiler testified that the drug infliximab is another rheumatoid arthritis medication, much like rituximab, and acts to suppress aspects of the immune system to reduce inflammation.   He confirmed that, over time, corticosteroids suppress the immune system.

24.  Dr. Wohlfeiler testified that the drug voriconazole is an anti-fungal medication. He stated that anti-fungal medications can be frequently used in HIV because the part of the immune system that is destroyed by the disease controls fungal infections. voriconazole is typically used to treat invasive aspergillosis, a very aggressive dangerous kind of fungus.  It can also be used in the HIV setting instead of the drug fluconazole for treating a resistant fungal infection in the mouth and throat.   Voriconazole is usually given orally because the same level of drug is reached in the patient whether it is taken orally or intravenously.  He stated that it probably would be given to a small number of HIV patients who might have resistant fungal infections, but would be given orally.   He stated that fluconazole would be used more than voriconazole in the HIV setting because there has been more experience with fluconazole, and there is very little toxicity associated with it.  Dr. Wohlfeiler testified that neither drug would typically be given as a preventive measure.   However, voriconazole would be used in rare cases where a patient

---

[6]  Allegedly fraudulent billings in the case at bar involved the use of injections rather than treatment with the oral form of this drug.

16

had HIV and either had aspergillosis (because fluconazole does not work against aspergillosis), or where patients have failed treatment with fluconazole.

25.  Dr. Wohlfeiler admitted that during the treatment of his patients, he has successfully used neupogen to treat neutropenia, successfully used voriconazole once or twice, and has successfully used steroid with his patients.  He testified that it is rare to treat HIV patients for rheumatoid arthritis because HIV suppresses the immune system, the activation of which is the underlying cause of rheumatoid arthritis.

26.  Dr. Wohlfeiler is unaware of any guideline by any state or federal agency that would preclude giving neupogen to treat neutropenia or gamma globulin to address thrombocytopenia of other issues in HIV patients.  Dr. Wohlfeiler testified that some of the package inserts for the medications at issue would indicate that they were contraindicated for use in patients whose immune systems are suppressed.

27.  Dr. Wohlfeiler reviewed his electronic patient records from 2005 forward to determine if he had administered the drugs in question.   He testified that with the exception of epoetin, neupogen and some corticosteroids, none of the other drugs were found in his patients records.  He also testified that since the time that the "cocktail" of drugs came into use, he has not used gamma globulin.

28.  Dr. Wohlfeiler testified that immune suppressant therapy is rarely used in a patient who has an immune suppressive disease such as HIV, and such treatment would, essentially be contraindicated in those patients.

29.  Dr. Wohlfeiler testified that he based his opinions on the use of certain drugs for treating patients with HIV/AIDS on his experience as a doctor treating his patients, as well as the guidelines issued by the Department of Health and Human Services and the International AIDS society, and articles and educational programs that he has attended.

17

He testified that he does not know if any of the patients at issue in this matter had any other conditions or symptoms related to HIV/AIDS since he did not review the patient files.  Dr. Wohlfeiler testified that he could not reach any opinion on whether it was medically necessary to prescribe any of the drugs to any specific patient in this case.   He testified that his opinions regarding whether a particular drug is medically necessary in the treatment of HIV/AIDS is based upon the standard of care in the medical community.

30.  Dr. Wohlfeiler admitted  that he does not know how Medicare defines "medically necessary", that he does not review the Medicare policies and does not consider the Medicare policies as part of the material he uses to determine the standard of care.  Dr. Wohlfeiler believes that the Medicare Guidelines are for determining billing and what services will be paid for, and not necessarily what the appropriate or standard of care or treatment is for patients.

31.  Dr. Wohlfeiler's opinions regarding the drugs that he was not familiar with prior to the government asking for his opinion, were not based upon his personal experience in treating patients but rather were based on the Physician's Desk Reference, websites and discussions he has had with other people.

32.  Dr. Wohlfeiler testified that he would be comfortable submitting his opinions on the medical necessity of the drugs at issue, for publication.  He testified that his opinions as expressed in the December 31, 2008 letter from Mr. Darden to him, are opinions that are generally and commonly accepted in the medical community.  Dr. Wohlfeiler based those opinions on a variety of sources, including treatment guidelines, conferences and textbooks.

33.  Dr. Wohlfeiler is a knowledgeable and credible witness, who has extensive medical training both through his education, research and his private medical practice.

The undersigned specifically finds and concludes that he is qualified to testify to the community standard as to medically necessary and appropriate medical treatment for HIV/AIDS patients.

IV.    **LEGAL ANALYSIS**

A.    **Federal Rule of Evidence 702**

Rule 702 of the Federal Rules of Evidence governs the admissibility of testimony by expert witnesses.  The rule provides, in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As stated by the Eleventh Circuit in *United States v. Frazier*, 387 F. 3d 1244 (11th Cir. 2004), "Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence." *Id. (citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 n.7 (1993)).  Trial courts are also required to play the same gatekeeping function in considering the admissibility of technical expert evidence. *Kumho Tire v. Carmichael*, 526 U.S. 137, 147 (1996).  This function "inherently require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702.  *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253 at 1257 (11th Cir. 2002).

In performing this function, the Supreme Court held in *Daubert* that a court must consider whether:  1) the expert is qualified to testify competently regarding the matters he/she intends to address; (2) the methodology by which the expert reaches his/her

conclusions is sufficiently reliable as determined by the sort of inquiry mandated by the Supreme Court's ruling in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (citing *Daubert*, 509 U.S. at 589).

   1)   <u>Expert Qualifications</u>

   As to the first prong of the Daubert analysis, the expert's qualifications, Rule 702 provides, "... a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  In the case at bar, Defendants have not challenged Dr. Wohlfeiler's qualifications as an expert to testify generally on the treatment of HIV/AIDS patients.  Moreover, the record demonstrates that Dr. Wohlfeiler has had extensive medical education and training in the treatment of HIV/AIDS patients.  In addition, as set forth above, he has maintained a private practice for over eighteen years that focuses almost exclusively on the treatment of HIV/AIDS patients and the complications arising from those conditions.  Dr. Wohlfeiler currently treats approximately 1200 HIV/AIDS patients, many as a primary care physician.  He has conducted research and published articles on HIV and AIDS, is a member of several HIV treatment organizations, and has given lectures on various pharmaceuticals used in the treatment of HIV/AIDS patients.   Based upon Dr. Wohlfeiler's experience, training and education, the undersigned finds that he is qualified to testify as an expert on the medical necessity of certain drugs and therapies and general treatment of HIV/AIDS patients.

   2)   <u>Methodology Relied on by Expert</u>

   The Defendants do, however, challenge the admissibility of Dr. Wohlfeiler's testimony and opinions on several grounds, unrelated to his credentials.  First,

Defendants challenge the reliability of the methodology used by Dr. Wohlfeiler in arriving at his conclusions regarding the medical necessity of the use of certain pharmaceuticals and treatment procedures for HIV/AIDS patients.  Specifically, Defendants argued at the Daubert hearing that Dr. Wohlfeiler's testimony was based only on his own personal experience in treating his patients and was not reliable as he did not list any specific studies or scientific experiences to support his opinion.

Generally, to assess the reliability of an expert opinion, the Court considers a number of factors, including: (1) whether the expert's theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique, and (4) whether the technique is generally accepted in the field.  *United States v. Frazier*, 387 F.3d at 1262; see also *United States v. Brown*, 415 F.3d 1257, 1266-67 (11th Cir.2005) (citing *Daubert*, 509 U.S. at 593-94).  However, these factors are only illustrative and may not all apply in every case. *Frazier*, 387 F.3d at 1262.

Further, in *Frazier*, the Eleventh Circuit, in evaluating the reliability of expert opinions, discussed scientific expert opinions as well as non-scientific experience-based testimony and stated that how to go about determining whether particular expert testimony is reliable may vary from case to case. *Frazier* at 1261-62.  In addition, regardless of the specific factors considered in evaluating the reliability of expert testimony, "[p]roposed testimony must be supported by appropriate validation-i.e., 'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 590).  The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded. *Id.* (quotations and citations omitted). If the witness is relying solely or primarily on experience, then the

21

witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Id. (quotations and citations omitted).*

In applying these principles in *Frazier*, the Eleventh Circuit evaluated whether the district court abused its discretion by excluding some of an expert witness' opinion testimony because the witness failed to establish its reliability. *Id*. at 1264.  The reviewing court affirmed the district court's decision to exclude the testimony, and stated,

> [T]he expert said his opinion was based on his experience, and on various texts in forensic investigation.  However, even after repeated prompting, [the witness] never explained just how his own experience, or the texts he mentioned, supported his...opinion.  Indeed [the witness identified only a single investigation he had worked on..."

*Id.* at 1265.  The Court continued,

> Since [the witness] was relying solely or primarily on his experience, it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case.

*Id*.  In addition, the court found the witness' testimony to be imprecise and unspecific. *Id.* at 1266.

### i) Source of Dr. Wohlfeiler's Opinion

In this case, Defendants have questioned whether Dr. Wohlfeiler relied on proper authorities and scientific data in opining that certain drugs or treatments were not medically necessary for the treatment of HIV/AIDS patients.  At the hearing, Dr. Wohlfeiler identified text books that he relied on in reaching his opinion, including AIDS Therapy and a guide to treatment from the American Academy of HIV Medicine.  He also testified that he relied on his practice's patient database of 2500 patients to determine the number of times that he prescribed the medications at issue in his treatment of HIV/AIDS patients.

22

Moreover, unlike the witness in *Frazier*, during his testimony at the Daubert hearing, Dr. Wohlfeiler made clear that he reached his opinions based upon his numerous years as a physician treating HIV/AIDS patients and his acquired knowledge through that experience including his review of medical text books, treatises, and on-line research materials as to what treatments and medications are generally appropriate and medically necessary in the treatment of HIV/AIDS patients. Further, Dr. Wohlfeiler's testimony was specific and precise as to the use of the drugs identified by the Government in the treatment of HIV/AIDS. In his testimony, Dr. Wohlfeiler identified and discussed each individual drug and provided specific medical situations where those drugs would be appropriately used in the treatment of HIV/AIDS patients. Dr. Wohlfeiler also was unequivocal in his opinion that it would be rare to use certain of the drugs and therapies in the treatment of HIV/AIDS patients. His testimony was neither imprecise nor unspecific. Thus, as required by Rule 702, and *Kumho tire*, the undersigned finds that Dr. Wohlfeiler's opinions regarding the medical necessity of particular treatments or drugs for HIV/AIDS patients are grounded in reliable principles including his extensive experience in treatment of that patient group.

ii) Dr. Wohlfeiler's Failure to Review Patient Files

The Defendants also argue that Dr. Wohlfeiler did not review the patient files in this case. To the extent that this argument calls into question the reliability of the witnesses's opinions and whether the witness has applied the principles and methods reliably to the facts of the case, the undersigned finds the Defendants' argument without merit. Defendants misperceive the nature and basis for Dr. Wohlfeiler's testimony and opinions as it applies to this case. Dr. Wohlfeiler did not opine as to whether a particular treatment was medically necessary in the specific cases of the Medicare beneficiaries in

23

this matter, rather his opinions address the medical necessity of these specific treatments in HIV/AIDS patients, generally.  His opinions are based the data and/or facts derived from his treatment of 1250 HIV/AIDS patients, and his review of relevant medical literature, as he testified to in the hearing.  While the patient group that Dr. Wohlfeiler bases his opinions on may or may not identically mirror the profile of the Medicare Beneficiaries in this case, that does not render his opinions unreliable or inadmissible under *Daubert*.  Rather, differences between the Medicare Beneficiaries and the patients seen in Dr. Wohlfeiler's practice and experience may be the subject of cross-examination.  Indeed, as stated by the Supreme Court in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Thus, in the context of this case, Dr. Wohlfeiler's opinion on the medical necessity of the specific therapies and/or treatments for HIV/AIDS patients may be appropriately applied to the facts of this case, as it relates to the use of those specific therapies or treatments.

Moreover, it is important to note that the primary value of Dr. Wohlfeiler's testimony is to educate the jury about HIV/AIDS treatment generally, the uses for the various medications that are the subject of the allegedly fraudulent billing; and, to put into context and corroborate the testimony of the owners of M&P and the patient witnesses that the clinic was a sham from the outset, that the only reason the patients went there was because they were paid kickbacks, and that the patients did not need, or to some extent even receive, the treatments that were prescribed.  Thus, his testimony explains and corroborates the testimony of the percipient witnesses.

In support of its position that Dr. Wohlfeiler's methodology and foundation are

unreliable, Defendant Pacheco referred to *Washington v. Vogel,* 880 F. Supp. 1545 (M.D. Fla 1995),  at the *Daubert* hearing, and cited to that case in its Supplemental Motion in Limine  for support of its position.  However, *Washington* is distinguishable from the case at bar.  In *Washington*, the expert presented by the Government sought to introduce statistical proof that a significant disparity existed between the percentage of African American motorists and non-African American motorists who were routinely stopped on an interstate in a particular county.  The district court found that the proposed testimony was not reliable and did not allow it to be introduced at trial.  In so doing, the court first found that portions of the expert testimony would not have assisted the trier of fact in understanding the evidence in the case, as the videotapes of the traffic stops that the expert relied upon in reaching his conclusions were introduced at trial and the parties stipulated to the percentage of African Americans motorists depicted in the tape.  Further the court  found that the expert's statistical analysis was not supported by "good grounds" as the expert relied on a traffic study from New Jersey to generalize rates of traffic violations in Florida and was prepared to testify about another study that was clearly factually distinct from the traffic stop at issue in that case.  *Id.* at 1547.

In contrast, in this case, Dr. Wohlfeiler is not providing a statistical analysis, but rather is providing his opinion on the appropriate and medically necessary treatment of HIV/AIDS patients during the relevant time period based upon his continuous and extensive treatment of HIV/AIDS patients in the Miami area.   Although the Defendants argued at the hearing that Dr. Wohlfeiler's patient base is different than the patients in this case, it did not offer any evidence that would support the conclusion that the population that Dr. Wohlfeiler treats is different in any medical manner that would render his opinion about a proper course of treatment for HIV/AIDS patients either irrelevant or

unreliable.  Moreover, as stated above, such distinctions are appropriately dealt with on cross-examination rather than excluding the testimony in light of the circumstance presented here.

Further, the cases cited in Defendant Pacheco's Supplemental Motion in Limine primarily deal with scenarios when the expert is seeking to provide an opinion regarding causation as applied to a medical condition.  In *O'Conner v. Commonwealth Edison Company*, 13 F.3d 1090 (7th Cir. 1994), for example, the purported expert cited to authorities that did not support his opinion regarding the method of diagnosis and the witness failed to offer any personal study or experiments that would justify his conclusion about the cause of the plaintiff's condition, cataracts.  *Id*. at 1106-07.   The court found that the expert's limited experience in treating only five patients with radiation-induced cataracts in twenty years experience would not provide a sufficient basis for him to provide a scientifically sound opinion. *Id*.   Similarly, in *General Electric Company v. Joiner*, 522 U.S. 136 (1997), the case involved an expert's opinion regarding the causation of lung cancer in a person, based, in part,  upon the expert's extrapolation of studies conducted on the causation of cancer in mice.  The Supreme Court applied the abuse of discretion standard in reviewing the district court's decision to exclude the testimony and stated that the court could conclude that there was too great an "analytical gap" between the data and the opinion. *Id*. at 146.   Finally, in *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir. 1994), again the reviewing court examined the a district court's decision regarding the admissibility of an expert's testimony on the causation of certain illnesses in the plaintiffs.  The court in that case focused largely on the fact that the expert did not have sufficient information to render an opinion on the causation of the plaintiffs' illnesses, as the expert did not examine the patients or their medical charts

prior to providing an opinion on causation. *Id.* at 732.

In this case, Dr. Wohlfeiler is not providing an opinion on causation and, in fact, is not providing an opinion regarding the specific patients in this matter, at all. Rather, as discussed above, Dr. Wohlfeiler is providing an opinion about the treatment of HIV/AIDS patients generally, the nature of the medical diagnoses used to justify the therapeutic treatments, and the appropriate use of the medications which were the subject of the allegedly fraudulent claims. His opinions are supported by his years of experience as a medical doctor in that field. In addition, to the extent Dr. Wohlfeiler concludes, based upon his experience of treating HIV/AIDS patients and reviewing medical literature, that many of the drugs at issue would only be used to treat HIV/AIDS patients in rare circumstances, that conclusion is not too great an "analytical gap" to render it unreliable in this case. There is nothing speculative nor inherently unreliable about a physician who has specialized in a particular area for many years, opining that certain medicines are rarely used in the treatment of that specialized area. The cases presented by the Defendants are clearly distinct and are inapposite to this factual scenario.

iii) <u>Local Medical Review Policies (LMRPs)</u>

Finally, Defendants argue that the Local Medical Review Policies (LMRPs) clearly define what is medically necessary regarding certain HIV treatments, and thus Dr. Wohlfeiler's opinions are irrelevant.[7] Defendants' argument relies on the proposition that

---

[7] The undersigned notes that the Defendants have raised this issue of relevance in the 702 context and while the argument might also be raised pursuant to Rule 403, the argument also potentially bears upon the reliability of Dr. Wohlfeiler's opinions to the extent that those opinions do not comport with Defendants' premise that the LMRPs state that the drugs at issue are medically necessary for the treatment of HIV. Therefore, the undersigned will address the Defendants' arguments on this point as part of its Rule 702/703 analysis.

the LMRPs are determinative of what is medically necessary.  However, this proposition is incorrect.  In *Arrueujo* v. Thompson, 2001 WL 1563699  *1 (E.D.N.Y. July 3, 2001) for example, the court acknowledged that even under the pertinent LMRP in that case,  a determination of medical necessity for the submission of a claim typically requires the person seeking reimbursement to present supporting medical records. *Id* at *22.

Further, although Defendant Pacheco has submitted two LMRPs to support its position, it is clear that the very language contained in those documents indicate that a particular course of treatment may or may not be medically necessary [D.E. 249-2].[8]  In particular, Defendant Pacheco has submitted a portion of the Florida Medicare Part A Local Coverage Determination addressing the coverage for Epoetin Alfa, and points the undersigned to the section entitled "ICD-9 Codes that Support Medical Necessity" which lists the non-renal diagnostic codes for epoetin alfa including "042 Human immunodeficiency virus [HIV] disease]".   While Defendant Pacheco may be correct that Medicare will only reimburse for services performed under these guidelines, it does not follow that a code listing for HIV means that epoetin alfa is always medically necessary for the treatment of HIV.  Rather, the LMRP's do not set out courses of treatment but set guidelines on what will be reimbursed under Medicare, if appropriate.  In fact, the document submitted by the Defendant contain sections entitled "Documentation Requirements" and "Utilization Guidelines" which state,

> The physician must clearly document in the patient's medical record that all requirements have been met and support the medical necessity for the use of Epoetin alfa, including but not limited to covered diagnoses, appropriate

---

[8] Defendant Pacheco also submitted a LMRP for RHO (D) Immune Globulin (D.E. # 249-3).  However, at the beginning of the Daubert hearing, the Government clarified that RHO (D) was not a drug allegedly billed by M&P to Medicare and thus was not included in Dr. Wohlfeiler's opinion or testimony.

laboratory studies (including date & results of most recent HCT/HGB levels within last month), dosage, route of administration, frequency and duration of the treatment and the patient's response to therapy.  This information is normally found in the office/progress and laboratory results.

and

It is expected that these services would be performed as indicated by current medical literature and/or standards of practice.  When services are performed in excess of established parameters, they may be subject to review for medical necessity.

Under the Defendants' interpretation of these documents, the above quoted language would be meaningless as every time a physician billed for epoetin alfa for a patient who was diagnosed with HIV, Medicare would reimburse for that treatment even if the patient's records indicated that it was not medically necessary, or if the services were performed beyond the standards of practice as indicated by current medical literature.

Similarly, the Defendants have submitted a Medicare Coverage Database document for the drugs filgrastim and neupogen (D.E. # 249-3).  That document also contains a section entitled "Documentation Requirements" which refers to several pieces of information other than an underlying diagnosis that a physician must provide in order to obtain coverage.  Again, if the patient only needed to be diagnosed with a disease referenced in that section to determine medical necessity, the other Documentation Requirements, including the submission of records regarding the "administration and dosage" to the patient as well as the "patient's response to the treatment" would presumably not be necessary.  Simply put, the LMRPs are not dispositive of the issue of whether the medications and treatments allegedly administered were medically necessary.   Therefore, Dr. Wohlfeiler's opinions regarding whether a treatment is medically necessary are not preempted by the LMRPs and thus are not unreliable in this regard.  To the extent that there is any conflict between Dr. Wohlfeiler's opinions and the

29

LMRPs, it may be addressed on cross-examination.

The cases cited by the Defendants are not at odds with this interpretation.  Those cases do not stand for the proposition that every treatment given that might be covered under an LMRP will be covered as medically necessary.  In *U.S. v. Augustine Medical Inc.*, 2004 WL 256772 (D. Minn. Feb. 10, 2004), for example, the court did not state that any Medicare billing submitted pursuant to the LMRPs was per se medically necessary, and in fact, discussed cases under Medicare where the appropriate codes were actually used but the services billed for were inappropriate.  The case does not speak to the determination of medical necessity under the LMRPs nor fraud related to that determination, thus it is not instructive on this issue.  In *Metromed Laboratories, Inv. v. Health Care Service Corp.*, 1999 WL 58558 (N.D. Ill Feb. 3, 1999), the court did not determine or even state what the  LMRPs' definition of "medical necessity" was, or whether any medicines listed in the LMRPs as covered by Medicare were automatically deemed to be medically necessary.   Thus, consistent with the above analysis, the LMRPs merely set forth reimbursement and/or coverage that may be available under Medicare if it is determined that a medicine is medically necessary.

Along the same lines, Defendants argue that Dr. Wohlfeiler's opinions on medical necessity are not reliable as he testified that he is not familiar with the definition of "medical necessity" under Medicare.  However, the Defendants have failed to submit any evidence that suggests that there is a separate standard for medical necessity in the Medicare realm as opposed to in the medical community at large.  In addition, the documents submitted by the Defendants regarding coverage for epoetin alfa suggest that Medicare relies on the "standards of practice" in whether services should be performed.  Thus, absent evidence in the record to the contrary, there is no basis to find Dr.

30

Wohlfeiler's opinions unreliable in this area.

Moreover, Dr. Wohlfeiler has not been offered as an expert on Medicare procedures or policies.  His expertise relates to the use of certain treatments and drugs for HIV/AID patients as practiced in the medical community.  While Defendants correctly point out that this is not a medical malpractice case, and thus whether Defendants provided the most efficacious treatment to patients is not at issue, the fact that Dr. Wohlfeiler may not be an expert on Medicare procedures does not mean that his opinion about the medical necessity of the use of certain pharmaceuticals is not reliable as applied to this case.

### 3)   Testimony as Assisting Trier of Fact

Finally, as to the third Rule 702 prong, the undersigned finds that Dr. Wohlfeiler's testimony would assist the trier of fact in this case.  Expert testimony should be "the kind that enlightens and informs lay persons without expertise in a specialized field." *Cyr v. Flying J Inc.*, 2008 WL 2608127 (M.D. Fla. June 29, 2008) (quoting *United States v. Burchfield*, 719 F.2d 356, 357 (11th Cir.1983)).  Further, as stated in *Abramson v. Walt Disney World*, 370 F. Supp. 2d 1221 (M.D. Fla. 2005), the Eleventh Circuit "follows the generally accepted rule that expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." (internal citations omitted).

Here, the Government alleges that certain infusion and injection treatments were not necessary for the treatment of HIV/AIDS patients, and that the Defendants knowing that the treatments were not necessary, nevertheless billed Medicare for the treatments. The Government has focused the proposed expert testimony on the top ten drugs for each clinic that were the subject of the allegedly fraudulent claims.   By all accounts, at

31

least some of those drugs may be appropriate or necessary for the treatment of HIV/AIDS patients in certain situations.  However, the Government contends that the drugs are only necessary in rare HIV/AIDS cases, and in some cases are contraindicated for HIV patients. Whether and why those drugs might be necessary or used in the treatment of HIV/AIDS requires an understanding of the state of HIV treatment, including the medically recommended uses of those drugs in that treatment.  Thus, the determination of the medical necessity in this context is particularly complicated.  Accordingly,  the undersigned finds that Dr. Wohlfeiler would assist the trier of fact to understand the evidence or to determine a fact in issue.  *Accord United States v. Same*, 276 F. 3d. 131, 140, n.2 (3rd Cir. 2002) (holding that as government had burden of demonstrating that certain ambulance trips are not medically necessary, whether an ambulance trip is actually medically necessary is an issue on which the average juror could benefit from a physician's expert testimony).

In addition, courts have stated that "expert testimony is admissible if it will simply assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context." *Thomas v. Hubtex Maschinenbau GmbH & Co. KG*, Slip Copy, 2008 WL 4371977 *3 (M.D. Ga., Sept. 23, 2008) (citing 4 Joseph M. McLaughlin et al., Weinstein's Federal Evidence § 702.03[1] (2d ed. 2007).  In this case, the Government has indicated that Dr. Wohlfeiler's testimony will be presented in conjunction with other witnesses who will testify as to the alleged fraudulent nature of the clinics, including whether the patients actually received the billed treatments.  Dr. Wohlfeiler's testimony will therefore assist in providing an understanding of the medical aspects of the alleged fraud.

At the same time however, the Defendants' argument that Dr. Wohlfeiler's

testimony will improperly invade the province of the fact finder is without merit.  Dr. Wohlfeiler has offered no opinions regarding whether the Defendants believed that the treatments at issue were medically necessary or not.  His testimony is limited to what treatments generally are medically necessary in the treatment of HIV/AIDS patients.  While this testimony will undoubtedly be helpful in providing the fact finder with a context and understanding of what is medically necessary it in no way is determinative of whether the Defendants' conduct was fraudulent.   Also, to the extent that Dr. Wohlfeiler's opinions bear on the ultimate determination of whether the treatments were medical necessary, those opinions are admissible pursuant to Rule 704.

Thus, Dr. Wohlfeiler satisfies the Daubert standards as an expert on the issue of the treatment and medical necessity of certain drugs for HIV/AIDS.

### B.   The Probative Value of the Testimony:  Federal Rules of Evidence 401, 402, and 403

Although the undersigned has concluded that Dr. Wohlfeiler's testimony meets the requirements under Rule 702, as stated by the Eleventh Circuit in *Frazier*, "[b]ecause of the powerful and potentially misleading effect of expert evidence,...sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *Frazier,* 387 F. 3d at 1263.  Federal Rule of Evidence 403 provides, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Generally, Rule 403 is considered an extraordinary remedy that should be used sparingly because it allows the court to exclude admittedly probative evidence.  *U.S. v. Ross*, 33 F.3d 1507, 1524 (11th Cir.2004).  Thus, courts have stated that the discretion

to exclude evidence as unduly prejudicial is "narrowly circumscribe[d]." *United States v. Cross*, 928 F.2d 1030, 1048 (11th Cir.1991) (citation omitted).  *Accord United States v. Dean*, 221 Fed. Appx. 849 (11th Cir. 2007)

In *United States v. Achille*, 277 Fed. Appx. 875 (11th Cir. 2008) (unreported), for example, the Eleventh Circuit Court of Appeals found that the district court did not err in admitting the expert testimony of a physician in a health care fraud case who testified, among other things,  that the treatment prescribed by a defendant for a specific patient was not within the accepted standard of care for treatment of AIDS patients.  *Id*. at 878. Although the court reviewed the district court's determination under the plain error standard because the defendant failed to preserve the issue for appeal, the court nevertheless opined that the expert physician's testimony was relevant and probative and not unfairly prejudicial under Rule 403.

In addition, in *United States v. Rosin*, 263 Fed. Appx. 16, 29-30 (11th Cir. 2008) (unpublished), the Eleventh Circuit Court of Appeals held, in a health care fraud case similar to the case at bar, that it was not improper for the district court to admit the testimony of the government's expert witnesses regarding their own surgical practices. This testimony was found probative because it might lead the jury to conclude that the defendant's practice was fraudulent because the government expert witnesses diagnosed cancer at much lower rates and performed fewer surgeries than the defendant. .

In *Rossin*, the defendant challenged the testimony under Federal Rules of Evidence 401, 402 and 403, as not being probative and being unduly prejudicial to the defendant.   In rejecting the defendant's argument on those grounds, the court stated,

> The differences between the rates at which the Government's witnesses
> and [the defendant] diagnosed cancer and performed multi stage....surgery
> did not provide conclusive proof that some of the [the defendant's]

surgeries were medically unnecessary and fraudulent.  Nevertheless, if the testimony of the expert witnesses was believed, the stark differences between their surgical procedures and outcomes and [defendant's] were probative on the question whether [defendant] had defrauded the Medicare program by filing false claims.

Further, as to the prejudicial nature of the testimony, the court stated,

[Defendant] is right when he asserts the expert witnesses' testimony was prejudicial, as all evidence of guilt is intended to be.  It was not however, unfairly prejudicial in violation of the rules of evidence or [defendant's] rights under federal law.  The trial court did not err by failing to prevent the experts from testifying about their medical practices.

*Id.* at 29-30.

Further, the undersigned notes that in this District, in circumstances similar to the case at bar, two courts have admitted expert testimony.  In *United States v. Beatriz Delgado*, 08-20270-CR-MORENO, the Court admitted the testimony of Dr. Wohlfeiler, the same expert physician in this case, regarding the medical treatment of HIV/AIDS patients. (D. E. # 281; October 14, 2008 transcript at 9-10). In *Delgado*, Dr. Wohlfeiler did not testify regarding specific patient files that he reviewed, but rather offered his opinion generally on the medical necessity of medical treatments for HIV/AIDS patients, including the lack of medical necessity for the use of a specific drug at issue in that case.  Similarly, in *United States v. Hernandez*, 07-20291-CR-CMA (DE ## 144, 146, 168), another District Judge of this Court reached the same result in an analogous context regarding the medical necessity of certain pulmonary treatments.

Thus, the undesigned concludes that the proposed expert testimony is probative, and that the probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  In addition, it does not appear that it will cause undue delay, waste of time, or that it is cumulative.

**C.      Due Process**

Finally, the Defendants argue that their due process rights will be violated if Dr. Wohlfeiler is allowed to testify at trial.  The Defendants cite to cases that generally hold when a defendant reasonably relies upon a regulatory agency's affirmative representations that its behavior, which comports with those representations, was legal; it is a violation of due process for a defendant to then be prosecuted for that behavior.[9] However, as correctly noted by the Government, and as discussed above, the LMRPs did not determine that  all billing to Medicare by medical providers for services that may have been listed in those guidelines was medically necessary.  Thus, it is hard to fathom that the Defendants, or any medical providers, believed that billing for medically unnecessary services would be legal, simply because those services were listed on the LMRPs.  In addition, the Defendants may introduce evidence to rebut Dr. Wohlfeiler's testimony and establish that they had a good faith belief that the medicine and treatments for which they billed Medicare were medically necessary to treat HIV patients.  Moreover, the Defendants' argument on this point again mischaracterizes Dr. Wohlfeiler's opinions as he does not provide an opinion as to whether these specific treatments or medicines were medically necessary in this particular case, but rather explains the use of these drugs in the treatment of HIV/AIDS patients generally.   Accordingly, there is nothing in Dr. Wohlfeiler's opinion or likely testimony that violates the Defendants' due process rights.

---

[9]  To the extent that the Defendants intend to claim that the charges should be dismissed on this ground, the undersigned notes that this challenge is not properly before the Court in connection with the motions in limine to exclude expert testimony, but must be raised in a separate motion to dismiss or motion for judgment of acquittal at trial.

Therefore, based upon a review of the record as a whole, it is hereby

**ORDERED AND ADJUDGED** that Defendant Keith Russell's Motion to Exclude

Opinion Evidence (D.E. # 196) and Defendant Jorge Luis Pacheco's Motion to Exclude the

Government's Physician Witness, Dr. Michael Wohlfeiler, M.D. (D.E. # 198) and joined by

Co-defendant Eda Milanes (D.E. ## 237, 238), and the Supplemental Motion in Limine to

Exclude the Government's Physician Witness Under *Daubert* (DE # 261) are **DENIED.**

**DONE AND ORDERED** in chambers in Miami, Florida, on February 14, 2009.


*Andrea M. Simonton*
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**


**Copies furnished to:**
**The Honorable Ursula Ungaro, United States District Judge**
**All counsel of record via CM/ECF**