UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-20895-CR-UNGARO/SIMONTON

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EDA MILANES, et al.,

    Defendants.
_____/

### ORDER DENYING MOTIONS TO EXCLUDE 404(b) EVIDENCE

Presently pending before this Court are the Motions to Exclude 404(b) Evidence filed by Defendant Eda Milanes (DE # 156) and Defendant Jorge Pacheco (DE # 183). Defendant Keith Russell has adopted the motion filed by Defendant Pacheco (DE # 187). The Honorable Ursula Ungaro, United States District Judge, has referred these motions to the undersigned United States Magistrate Judge (DE # 174).[1] The Government has responded in opposition (DE ## 172, 244). A hearing on these motions was held on January 28, 2009. For the reasons set forth below, the Motion is denied, subject to certain limitations set forth in the body of this Order, without prejudice to renew at trial.[2]

---

[1] Although the motion filed by Defendant Pacheco was not independently referred to the undersigned Magistrate Judge, the parties concurred that since it involves exactly the same 404(b) evidence which is the subject of the referred motion it fell within the scope of the order of reference as to the first motion. This interpretation was verbally confirmed by the chambers of the referring District Judge.
    The undersigned has been advised that the remaining 404(b) motions will be handled by the District Judge.

[2] Since this Order is predicated upon the Government's proffer of expected testimony, and is only a pre-trial determination that the probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues and considerations of undue delay, the trial court will be in the best position to re-evaluate this determination during the course of the trial. *See United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990); *United States v. Rutkowski*, 814 F.2d 594, 598 (11th Cir.

I.      BACKGROUND

The Indictment in this case charges defendants Juan Marrero, Orlando Pascual, Jr., Belkis Marrero, David Rothman, Luz Borrego, Eda Milanes, Keith Russell, and Jorge Pacheco with conspiracy to commit health care fraud between August 2004 and November 2006, in violation of 18 U.S.C. § 1349 (Count 1); and with executing and attempting to execute a scheme to defraud the Medicare program, in violation of 18 U.S.C. §§ 1347 and 2 (Counts 2 - 7).[3]

The Indictment alleges that these defendants were involved in various capacities with two medical clinics, M&P Group of South Florida, Inc. and Medcore Group, LLC, which purported to provide injection and infusion treatments to patients diagnosed with HIV/AIDS or cancer; and, which billed Medicare for those services.[4]  According to the Indictment, the defendants conspired to defraud the Medicare program by submitting false and fraudulent claims regarding those purported treatments.  Specifically, the Indictment alleges that kickbacks and bribes were paid to Medicare beneficiaries at both clinics; that the injection and infusion treatments were not medically necessary; and,

---

1987)("Although defense counsel objected before trial to the admission of the evidence, the record reveals no objection during the trial.  'The overruling of a motion in limine is not reversible error, only a proper objection at trial can preserve error for appellate review.'") (citations omitted).

[3]  The Indictment also charges Defendants Juan Marrero, Orlando Pascual, Jr., and Belkis Marrero with various money laundering offenses related to the above health care fraud offenses.  Defendants Juan Marrero, Orlando Pascual, Belkis Marrero and Luz Borrego have entered guilty pleas and are awaiting sentencing.

[4]  Not all defendants were involved with both clinics.  According to the Indictment, Defendants Juan Marerro, Orlando Pascual, Jr. and Belkis Marrero owned and controlled both of these clinics, and defendant Rothman was a physician who was employed by both clinics.  However, defendant Borrego was a medical assistant employed only by Medcore.  Defendants Milanes and Pacheco were medical assistants employed only by M&P; and, defendant Russell was a physician employed only by M&P.

that medical records were fabricated to show that patients had received specific doses of injection or infusion, when the patients had not actually received the treatments or medications reflected on those documents.

The Indictment also includes six substantive counts which charge the commission of acts in execution of the scheme to defraud Medicare. These counts list six specific claims that were submitted to Medicare for payment in connection with medically unnecessary, and non-rendered injection or infusion treatments with respect to two patients–G.B. and R.C.

During the course of various hearings, as well as during the course of the guilty plea proceedings, the Government has clarified and elaborated upon its theory of the case and the evidence is seeks to introduce at trial.[5] Specifically, the Government intends to prove that these two clinics were established for the express purpose of defrauding Medicare by billing for medically unnecessary treatments and that <u>none</u> of the treatments for which Medicare was billed by these clinics were medically necessary. Thus, the Government contends that all of the certifications of medical necessity, which are part of every claim submitted, are false. The Government also contends that the evidence will show that the claims were also false because none of the claimed services were actually rendered with respect to the patients. Specifically, the Government stated at the hearing that its evidence will show that the clinics did not purchase enough of the

---

[5] The undersigned Magistrate Judge has held hearings on various motions filed by these defendants on January 7, 2009 (DE # 184), January 28, 2009 (DE # 240), January 30, 2009 (DE # 248), and February 6, 2009 (DE # 262). At each of these hearings the government has elaborated on its theory of the case and the evidence it seeks to use at trial. The factual bases to support the guilty pleas entered by defendants Pascual, Borrego, Juan Marrero, and Belkis Marrero are contained, respectively, in DE ## 178, 228, 229, and 230.

3

medications to provide the claimed treatments to all of the patients for whom they billed, and there was a systematic reduction of the amount of medication actually provided to each patient. In addition, some patients signed certifications of treatment for multiple visits in a week when, in fact, they only were present at the clinic once a week. Finally, the government contends that all patients received kickbacks. The government has provided the defendants with the names of all relevant patients, as well as superbills reflecting the treatments for which Medicare was billed.

     Dr. Russell was the physician who purportedly examined the patients at M&P, and prescribed the treatments. Defendants Pacheco and Milanes, who are husband and wife, worked at M&P as medical assistants and were responsible for helping to provide the purported treatments to patients. For example, if an infusion treatment was ordered, the medical assistant's role was to connect the patient to the machine and insure that the appropriate bag of medication was infused; or if an injection was ordered, they would administer the injection. The medical assistants prepared the superbills for treatments which formed the basis for billing Medicare; and, the treating physician signed those superbills. The government proffered that its evidence would also show that defendant Milanes also paid kickbacks to patients on various occasions.

     There were a total of 20 patients for whom M&P submitted claims; and, the total amount of these claims was $1,259,291.00. There were approximately 30 to 40 patients for whom Medcore submitted claims, and the amount of these claims totaled $4,040,895.00. The government proffered that M&P was established after Medcore was closed, and patients transferred to M&P from Medcore.

II. **FRAMEWORK FOR ANALYSIS**

In the Eleventh Circuit, the standard for admission of extrinsic bad act evidence under Rule 404(b) requires a showing that the evidence 1) is relevant to an issue other than the defendant's character; 2) is established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; and 3) the probative value of the evidence must not be substantially outweighed by unfair prejudice and must meet the other requirements of Rule 403.  *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003); *United States v. Cancelliere*, 69 F.3d 1116 (11th Cir. 1995); *United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995), *citing United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978).

In *Huddleston v. United States*, 485 U.S. 681 (1988), the United States Supreme Court explained the quantum of proof necessary under the second prong of this test to support the admission of this evidence.  This prong is a conditional fact determined under the provisions of Rule 104(b) of the Federal Rules of Evidence, and therefore "the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence;" rather, "[t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find" by a preponderance of the evidence that the defendant committed the extrinsic act. *Huddleston*, 485 U.S. at 690.

Finally, evidence which concerns an uncharged offense that arose out of the same transaction or series of transactions as the charged offense; or, pertains to the chain of events explaining the context, motive and set-up of a charged crime; or, evidence which is necessary to complete the story of the crime is admissible as intrinsic evidence even when it is not part of the crime charged.  *United States v. Fortenberry*, 971

5

F.2d 717, 721-22 (11th Cir. 1992); *United States v. Church*, 955 F.2d 688, 700 (11th Cir. 1992); *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985); *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983).  Since such evidence is viewed as intrinsic to the crime charged, it is not subject to a Rule 404(b) analysis.

Numerous cases have considered the admissibility of extrinsic act evidence in the context of fraud cases.  For example, in *United States v. Hewes*, 729 F.2d 1302, 1314-15 (11th Cir. 1984) the Eleventh Circuit upheld the admission of evidence of prior "bustout" and fraudulent franchising schemes to show that the bustout schemes alleged in the indictment were not merely business failures resulting from a string of bad luck.[6]  In reaching this result, the Court noted, "We have generally held that, if the extrinsic acts are similar to the charged offense in that they require the same type of intent and if the extrinsic acts are fairly proximate in time to the charges offenses, then the extrinsic act evidence is highly probative on the issue of intent."  Thus, where the extrinsic act evidence is used to show intent, the relevancy of this evidence is established where the same criminal intent is required for both the extrinsic act and the charged offense.

Even where the extrinsic evidence is not based on a prior conviction, and the defendants dispute the existence of criminal intent with respect to those acts, the Eleventh Circuit has held that prior acts may be used to establish criminal intent and knowledge with respect to the charged offenses.  *See United States v. Simon*, 839 F.2d 1461, 1471-72 (11th Cir. 1988) (evidence that defendants were involved in prior fraudulent

---

[6] A "bustout" scheme is a plan under which a person establishes a corporation; buys merchandise on credit from various suppliers; sells the merchandise at whatever price it will bring, frequently below cost; retains the proceeds as "salary" or for some other facially legitimate purpose; and then declares bankruptcy without paying for the merchandise.

telemarketing scheme for which others were indicted was relevant to prove criminal intent with respect to their subsequent participation in the charged telemarketing scheme); *United States v. Roe,* 670 F.2d 956, 967 (11th Cir. 1982) (defendants' association with previous similar business, which was under investigation at the time defendant left, was admissible where the government's purpose was to show defendants had prior knowledge and experience regarding how to run a business similar to the allegedly fraudulent business charged in the indictment; this was relevant to negate the defense that defendants were innocent bumblers).

Where the extrinsic act evidence is being used to show a common plan, scheme or design, however, the Eleventh Circuit has provided the following guidance:

> In this context, evidence of the "other act" is admissible only if it is so linked together in point of time and circumstances with the crime charged that one cannot be shown without proving the other. Courts have admitted extrinsic act evidence to show a defendant's design or plan to commit the specific crime charged, but never to show a design or plan to commit "crimes of the sort with which he is charged." Thus, proof of design or plan by showing the commission of similar acts requires more than merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.

*United States v. Dothard*, 666 F.2d 498, 502 (11th Cir. 1982) (citations and internal quotation marks omitted).

      III.      <u>THE PROPOSED 404(b) EVIDENCE IN THE CASE AT BAR</u>

At the outset, it is important to note that the government does not agree with the characterization of the challenged evidence as extrinsic evidence of other crimes which is subject to an analysis under Rule 404(b). Rather, the government contends that the evidence is actually intrinsic direct evidence of the crimes charged since it is necessary

7

to complete the story of the charged offenses and is inextricably intertwined with evidence of the charged offenses.

The government seeks to offer evidence that defendants Pacheco, Milanes, and Russell also worked at another clinic, Tendercare Medical Center ("Tendercare"), where they committed the same type of Medicare fraud with respect to HIV/AIDS patients. In addition, the Government seeks to offer evidence that defendants Pacheco and Milanes worked at a third clinic, Sunshine Diagnostic and Medical Center ("Sunshine"), where they committed the same type of fraud when billing private insurance companies, pursuant to a Medicare Advantage plan, with respect to HIV/AIDS patients. The proposed evidence with respect to each of these clinics is discussed separately below.

A. Tendercare

The government seeks to admit evidence of the defendants' activities at Tendercare through the testimony of co-defendant Belkis Marrero, bank records, Medicare records and patient testimony. The government proffered the following evdience. Belkis Marrero was one of the three owners of the clinics that are the subject of the present Indictment–Medcore and M&P. When she was closing Medcore, and opening M&P, she called her friend, Maria Marrero, who was the owner of Tendercare. Belkis Marrero told Maria that she had lost co-defendant Dr. Rothman, who was the physician at Medcore, and that she needed help to start M&P. Belkis Marrero made it clear to Maria that M&P was going to be used to provide medically unnecessary services to HIV/AIDS patients. Maria then told Belkis Marrero that she would send her Dr. Russell and two medical assistants–Jorge Pacheco and Eda Milanes–who at that time worked for Tendercare, and who could work at M&P.

According to the government, testimony from Belkis Marrero, patients, and

Medicare billing data as well as billing records from Tendercare's third party billing agent, demonstrate that Tendercare provided the same medically unnecessary infusion and injection treatments to HIV/AIDS patients as Mecore and M&P. In addition, the patients at Tendercare, like the patients at M&P, were paid kickbacks to induce them to participate in the scheme to defraud Medicare. The government does not intend to elicit any expert testimony with respect to Tendercare in particular, but the expert testimony regarding the treatment of HIV/AIDS patients that it intends to elicit from Dr. Wohlfeiler with respect to Medcore and M&P will also be applicable to the treatment rendered at Tendercare.

The government contends that bank records will demonstrate that all three defendants worked at Tendercare before, during, and after they worked at M&P. The government provided the following chart to show the dates of employment at both clinics:

|  | **Pacheco** | **Milanes** | **Russell** |
|---|---|---|---|
| **M&P** | **Mar - Nov 2006** | **Mar - Nov 2006** | **Mar - Nov 2006** |
| **Tendercare** | **Jul 2005 - May 2008** | **Jun 2005 - Jun 2008** | **Oct 2004 - present** |

The government asserts that during the period of overlap, the billing records from both M&P and Tendercare demonstrate that defendants were billing for work performed at both clinics on the same days, thus corroborating the evidence that patients were billed for treatments not received.

In addition, the government has proffered that when M&P was sold in November 2006, the defendants continued to work at Tendercare and that defendant Milanes recruited certain patients of M&P to go to Tendercare, where they engaged in the same fraudulent scheme. The patient testimony and billing records will demonstrate the

9

overlap of four patients, according to the following chart provided by the government:

|  | M&P Approx. Dates | Tendercare Approx. Dates |
|---|---|---|
| N.G. | Mar 2006 - Sept 2006 | Oct 2006 - Nov 2007 |
| B.C. | Jun 2006 - Sept 2006 | Oct 2006 - Jan 2007 |
| R.C. | May 2006 - Sept 2006 | Mar 2007 - Oct 2007 |
| D.A. | May 2006 - Sept 2006 | Mar 2007 - Oct 2007 |

B. **Sunshine**

The government proffered that Sunshine billed for the same medically unnecessary treatments to HIV/AIDS patients as Medcore, M&P, and Tendercare. Sunshine did not directly bill Medicare, however, but billed private insurance companies who provided coverage under a Medicare Advantage insurance program. Defendants Pacheco and Milanes worked at Sunshine between August 2008 and September 2008. Defendant Russell never worked at Sunshine.

There is one patient as to whom both M&P and Sunshine billed for treatments.[7] M&P billed for treatments purportedly provided to patient N.G. from March 2006 through September 2006; the government alleges that defendant Milanes recruited this patient to move to Tendercare when M&P closed and that Tendercare then billed for purported treatments for N.G. from October 2006 through November 2007; and, that Sunshine billed for such treatments from August 2008 through September 2008, which coincides with the dates that defendants Milanes and Pacheco worked for Sunshine.[8] It is not clear

---

[7] The government proffered at the hearing that there were two such patients; but, in its responsive memorandum filed after the hearing, the government only identified one patient.

[8] The undersigned notes that the Indictment in the case at bar was returned under seal on September 25, 2008, and the defendants made their initial appearances in Court on these charges on October 7, 2008 (DE ## 76-82). Defendants Pacheco and

whether this patient will be testifying at the trial in this case, although at the hearing the government gave this impression to the Court. The defendants stated, without dispute from the government, that there are no documents prepared by the defendants with respect to the allegedly fraudulent billing by Sunshine.

There is no apparent relationship between the owner(s) of Sunshine and the owners of M&P, Medcore, or Tendercare.

IV. **LEGAL ANALYSIS**

The government argues that the above evidence is admissible for multiple purposes; and, that it is admissible as intrinsic evidence of the crime as well as extrinsic evidence under Rule 404(b).

A. **Intrinsic Evidence Analysis**

First, the government argues that the role of these defendants at Tendercare before, during and after their employment at M&P is inextricably intertwined with the fraudulent scheme charged in the case at bar. In this regard, the government emphasizes that these three defendants worked together at Tendercare for Maria Marrero, a friend of Belkis Marrero, and that they only went to work for M&P after Maria Marrero agreed to help Belkis Marrero establish M&P as a fraudulent clinic. Thus, the government contends that the fraudulent activities at Tendercare are necessary to put in context the activities of the defendants at M&P, and the relationship among the co-conspirators. Moreover, the government argues that evidence that the defendants were working for Tendercare at the same time that they were working for M&P corroborates

---

Milanes were precluded from working in the health care field as a condition of their release on bond (DE ## 53, 128). The government has not indicated, however, that it seeks to elicit any testimony regarding the reasons these defendants stopped working at Sunshine.

11

the testimony that patients did not receive treatments on all the days for which treatments were billed since the defendants could not be in two places at the same time. Finally, the government states that the intertwined nature of the two clinics is demonstrated by the fact that after M&P was sold, these three defendants continued to work at Tendercare and that Milanes recruited four patients from M&P to Tendercare. Milanes and the owner of Tendercare reached the same kickback arrangement with these patients that the patients previously had with M&P.

The government also argues, somewhat weakly, that the activities at Sunshine are inextricably intertwined with the activities at M&P. Presumably this argument is based upon the fact that one patient who started with M&P and then transferred to Tendercare, later transferred to Sunshine.

The defendants have countered by arguing that it is not necessary to introduce any testimony regarding Tendercare or Sunshine for the government to complete the story of what happened at M&P.  With respect to Tendercare, the defendants argue that it is unnecessary for the government to refer to Tendercare in order to complete the story of the alleged criminal activity; that it is irrelevant to show where defendants Milanes, Pacheco and Russell came from, or why they were hired by Belkis Marrero. Rather, the defendants contend that the government has ample proof that these three co-defendants knew each other and Belkis Marrero by the fact that they all worked together at M&P. They also claim that whether treatment of patients at Tendercare was medically necessary or patients were paid kickbacks, is not required to complete an explanation of medical necessity or the payment of kickbacks at M&P. The operations of the two clinics were entirely separate. In addition, the defendants emphasize that there is only a slight overlap of four patients between these two clinics. Finally, the

defendants dispute the government's contention that its evidence shows that they billed for services being rendered at both clinics at the same time.  The defendants contend that the government's evidence only shows the days for which treatments were billed, but does not establish that the treatments were rendered at the same time of day.

With respect to Sunshine, the defendants argue that Sunshine and M&P are wholly unrelated, and there is no evidence that the owners of M&P even knew the owners of Sunshine.  Defendants Pacheco and Milanes left Tendercare, respectively, in May 2008 and June 2008, and began to work at Sunshine in August 2008; defendant Russell continues to work at Tendercare and never worked at Sunshine.  In addition, the defendants point out that Sunshine did not have a Medicare contract and did not directly bill Medicare, unlike Tendercare and M&P.  The defendants therefore contend that it is not clear that the payment of kickbacks was illegal, since the illegality of kickbacks is based upon the existence of a contract that prohibits them.  The government contends that it is irrelevant to the charges in the case at bar whether the payment of kickbacks is illegal; that the purpose of introducing evidence of kickbacks is to explain why the patients would be involved in a fraudulent billing scheme.

The undersigned finds that the activities of these defendants at Tendercare is somewhat intertwined with the activities that occurred at M&P.  *See United States v. Johnson*, 265 Fed. Appx. 757, 759 (11th Cir. 2008) ("[A]n uncharged crime about the chain of events explaining the context, motive and setup of the crime properly is admitted if linked in time and circumstances with the charged crime or forms an integral and natural part of an account of the crime").  The reason that these defendants came to work at M&P, which was established for the purpose of committing Medicare fraud, was because their employer at Tendercare vouched for them with Belkis Marrero.  The pre-

existing working relationship will put in context the working relationship at M&P, explaining why they believed they could trust each other in this new fraudulent scheme. In addition, the government has proffered that evidence of their concurrent work at Tendercare corroborates the testimony of witnesses that the treatments which they claim to have rendered at M&P did not actually occur. Therefore, evidence of the prior work at Tendercare meets the threshhold for admissibility independent of Rule 404(b). However, it is still subject to the balancing test under Rule 403 to determine whether the probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues or considerations of undue delay. *See United States v. Fallen*, 256 F.3d 1082, 1091 (11th Cir. 2001). Those considerations might result in a limitation on the evidence of Tendercare's operations. For example, the court could consider whether to eliminate the "bad act" portion of the testimony and limit the evidence to the fact that the three had previously worked together at another clinic and had been referred to Belkis Marrero by the owner of that clinic; and, testimony regarding the treatments provided at that clinic concurrent with the dates of treatment at M&P could be limited to showing the dates of those treatments. Therefore, even though the evidence is somewhat intertwined, the undersigned has determined that it is appropriate to analyze the admissibility of this evidence under the dictates of Rule 404(b).

With respect to the operations of Sunshine, the undersigned concludes that the activities that occurred at that clinic are not intertwined with the activities at M&P. As pointed out by the defendants, there is no overlap in time since M&P was sold in approximately November 2006 and the defendants' work for Sunshine did not begin until August 2008; there is no overlap or relationship in clinic ownership; only defendants Pacheco and Milanes (who are husband and wife) went to work there, and there is only

one overlapping patient.

**B.     Extrinsic Evidence Analysis**

**1.  Proof that the Defendants Committed the Extrinsic Acts**

The first prerequisite to the admissibility of extrinsic act evidence is that there be sufficient proof that the defendants committed the extrinsic acts.  The government argues that it has sufficient evidence to establish that defendants Pacheco, Milanes and Russell worked at Tendercare before, during and after the time they worked at M&P, and performed the same acts with respect to fraudulent billings for treatment of HIV/AIDS patients, by means of testimonial evidence from Belkis Marrero and the patients, and by documents including bank records and billing records.  The government argues that it has sufficient evidence to establish that defendants Pacheco and Milanes worked at Sunshine in the same capacity by bank records showing their employment, Medicare billing data, and testimony by patients.  *See* (DE # 178) (co-defendant Orlando Pascual's Factual Proffer, stating that "Russell, Milanes, and Pacheco, who were already working at Tendercare, all then came to M&P to work there as well.").

Although the defendants contest the sufficiency of the proof, the undersigned concludes that the above proffers are sufficient for a jury to find by a preponderance of the evidence that the defendants worked at the respective clinics in connection with treatments to HIV/AIDS patients for which fraudulent billings were submitted.  *See United States v. Bowe*, 221 F.3d 1183, 1192 (11th Cir. 2000) ("[T]he uncorroborated word of an accomplice . . . provides a sufficient basis for concluding that the defendant committed extrinsic acts.").

15

**2. Proper Purpose**

The government contends that the evidence of the defendants' actions at the other clinics is relevant to prove criminal intent on the part of the defendants; to show their relationship with each other; to show their knowledge of the treatment procedures to rebut the anticipated defense of Pacheco and Milanes that they were just following a physician's orders and did not realize that this was a fraudulent billing scheme; and to show that the activities at M&P were part of a common plan or scheme to obtain payment for the medically unnecessary treatment of patients suffering from HIV/AIDS.

The defendants have not specifically focused on this element, except slightly in the context of their arguments regarding the insufficiency of the government's proof to establish that they committed the extrinsic acts and, more strongly, in the context of their arguments that the probative value of this evidence is substantially outweighed by the prejudicial effect.

The undersigned finds that the government has demonstrated a proper purpose in seeking the admission of this evidence, particularly with regard to Tendercare. The undersigned concurs with the argument of the government that the activities of these defendants at Tendercare are interrelated with their activities at M&P in a variety of ways. The activities at Tendercare are relevant to explain how these defendants came to be involved in the operations at M&P, why they were trusted by Belkis Marrero and each other to engage in the systematic preparation of false superbills, and their intent to engage in fraud. *See United States v. McCrimmon*, 362 F.3d 725, 730 n.2 (11th Cir. 2004) (affirming conviction relating to defendant's operation of a Ponzi scheme where trial court admitted evidence relating to defendant's prior involvement in a similar scheme to explain defendant's relationship with a co-conspirator, as well as the "chain of events"

16

that led to the formation fo the Ponzi scheme charged in the indictment); *United States v. Scop*, 940 F.2d 1004, 1009 (7th Cir. 1991) ("Other acts evidence is admissible to complete the story of defendants' familiarity or relationship."). The extent of their experience in this area also tends to negate a defense that their actions were the result of an honest mistake during the relatively brief period of time that they worked at M&P (as contrasted with the longer period of time that they worked at Tendercare). *See United States v. Cruz*, 225 Fed. Appx. 807, 811-12 (11th Cir. 2007) (holding that evidence of defendant's prior conviction was admissible to show lack of mistake based on similarity between prior offense and charged offense).

Moreover, the post-M&P work activities at Tendercare as well as Sunshine provide evidence that the treatments were given as part of an ongoing and common plan and scheme to treat or purport to treat HIV/AIDS patients with medically unnecessary but financially lucrative procedures and medications. Under the test established in *Dothard*, *supra*, the undersigned finds that the overlapping patients, as well as the similarity of the methods, demonstrate "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." *See also United States v. Hinostroza*, 297 F.3d 924, 927-28 (9th Cir. 2002) (permitting introduction of evidence of similar bad acts occurring subsequent to the charged conduct).

   3. <u>Probative Value</u>

The probative value of the activities at Tendercare is significant and not outweighed by the prejudicial effect. To the extent that claims were submitted for treatments at both clinics on the same days, it is direct corroborative evidence of criminal knowledge and intent. *See United States v. Marti*, 294 Fed. Appx. 439, 447 (11th

Cir. 2008) (evidence of defendant's prior uncharged conduct admitted as extrinsic evidence where it constitutes direct evidence of defendant's involvement in charged conspiracy). In addition, the activities which preceded M&P explain why the defendants trusted each other, and how the operation at M&P was started. *See McCrimmon*, 362 F.3d at 730 n.2; *see also United States v. Sparkman*, 500 F.3d 678, 683-84 (8th Cir. 2007) (permitting introduction of prior instances of insurance fraud "if the prior fraud is similar to and not too remote in time from the charged fraud."); *Scop*, 940 F.2d at 1009 (holding that evidence was not unduly prejudicial where it "concerned truly similar activities rather than inflammatory criminal acts."). The activities at Tendercare which post-dated M&P demonstrate that the M&P activities were part of a plan on the part of these defendants to continue to profit from the fraudulent billing scheme. Patients from M&P were specifically recruited to go to Tendercare to continue this illegal venture, albeit with new participants. *See United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997) (probative value of extrinsic evidence measured by "prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness."); *United States v. LaSpesa*, 956 F.2d 1027, 1036 (11th Cir. 1992) (district court properly admitted evidence of prior fraud that was "virtually identical" to transactions described in indictment because it was probative of criminal intent).

   The probative value with respect to Sunshine is more problematic. However, to the extent that the government seeks to offer testimony that a patient who began at M&P was then recruited by defendant Milanes to go to Tendercare, and then went to Sunshine after defendants Milanes and Pacheco went there, the undersigned finds that the probative value is not outweighed by the prejudicial effect. Similarly, to the extent that there is testimony that defendant Milanes paid money to patients at Sunshine to induce

them to undergo treatment at Sunshine and/or permit Sunshine to bill for such purported treatments; and to the extent that either defendant Milanes or defendant Pacheco was responsible for purported treatments which were the same as treatments rendered at M&P, and the subject of such billings, the probative value is not outweighed by the prejudicial effect since it appears part of the common plan or scheme and further demonstrates an intent to engage in fraudulent medical billing practices.  Thus, at least to this limited extent, it appears that evidence regarding the defendants' activities at Sunshine should be admitted.  *See United States v. Vitrano*, 746 F.2d 766, 770 (11th Cir. 1984) (finding that district court correctly admitted testimony regarding mail fraud defendant's earlier attempt to purchase artwork without paying for it, in a manner similar to the charged offense).

     A different conclusion is reached with respect to the decision whether to admit other evidence regarding the activities at Sunshine, and Sunshine's overall billing records.  The defendants worked at Sunshine for only a brief period of time.  The government's description of the evidence that links these defendants to the allegedly fraudulent billing by Sunshine is vague, and apparently there are no documents that these defendants prepared.  It is also unclear how many people worked at Sunshine besides these defendants, how many patients were treated, and how much work the defendants did during the "Aug-Sept 2008" period of time that they were employed by Sunshine.  Based upon the government's sparse response with respect to Sunshine, the lack of temporal continuity, and the lack of relationship between Sunshine and either M&P or Tendercare, it appears to the undersigned that the danger of unfair prejudice, confusion of the issues, and unduly prolonging the trial, by permitting the wholesale introduction of Sunshine's billing records substantially outweighs the probative value.

Of course, the relevance of the defendant's activities at Sunshine may become greater during the trial, and this ruling is without prejudice to the government's rights to revisit this determination at that time.  Similarly, it may appear during the course of the trial that evidence of the defendants' brief participation in the activities of Sunshine, almost two years after they left M&P presents such a danger of confusion and undue delay that the evidence should be excluded entirely.  Because the admissibility of extrinsic evidence calls for "a commonsense assessment" of the probative value of the evidence and the potential prejudicial effect it may have on the jury, *Dothard*, 666 F.2d at 502, the District Court will be in a better position to determine the need for the introduction of the 404(b) evidence at trial.

Therefore, based upon a review of the record as a whole, it is hereby

**ORDERED AND ADJUDGED** that the Motions to Exclude 404(b) Evidence filed by Defendant Eda Milanes (DE # 156) and Defendant Jorge Pacheco (DE # 183) are **DENIED WITHOUT PREJUDICE**, as stated, and subject to the limitations, in the body of this Order.

**DONE AND ORDERED** in chambers in Miami, Florida, on February 17, 2009.

_____
ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable Ursula Ungaro, United States District Judge
All counsel of record via CM/ECF